LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

ROBERT A. BERRY, ISB #7742
Deputy Attorney General
954 W. Jefferson Street, 2nd Floor
P. O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:      (208) 854-8073
robert.berry@ag.idaho.gov
Attorney for Defendant Lawerence Denney

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| RYAN ISBELLE,<br><br>  Plaintiff,<br><br>vs.<br><br>LAWERENCE DENNEY,<br><br>  Defendant. | Case No. 1:19-cv-00093-DCN<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |

COMES NOW Defendant, Idaho Secretary of State Lawerence Denney, by and through undersigned counsel, and hereby submits this memorandum in support of his Rule 12(b)(6) Motion to Dismiss Amended Complaint, filed herewith.

**I.   INTRODUCTION**

Idaho's geographic distribution requirement for ballot initiatives does not violate the Equal Protection Clause. The Supreme Court recently made clear that a State's decision to draw legislative districts to equalize total populations, rather than voter populations, does not violate the one-person, one-vote principle. *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).  That same analytical

MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT - 1

framework applies to geographic distribution requirements for ballot initiatives. The state-created right to sign a ballot initiative petition - which, unlike the right to vote, is not constitutionally guaranteed - cannot receive more rigorous protection under the Equal Protection Clause than the fundamental right to vote itself. Additionally, since submission of briefing last spring, the 10th Circuit Court of Appeals has issued a decision that is squarely on point in the instant matter. *Semple v. Griswold*, 934 F.3d 1134, 1136-42 (10th Cir. 2019). In that case, the 10th Circuit reversed the denial of a motion to dismiss and held that a geographic distribution requirement based upon total population, and not registered voters, did not violate the Equal Protection Clause. For these reasons, which are discussed in more detail below, the Court should grant the Secretary of State's motion to dismiss the amended complaint.

## II. PROCEDURAL BACKGROUND

The Court previously dismissed this matter for lack of standing, but allowed Plaintiff to file an amended complaint. (*See* Dkt. 10.) Plaintiff now alleges that "Idaho SB 1108 (2013) altered the formula in which signatures are counted during the initiative process." (Dkt. 11, p. 2 ¶ 5.) He claims "[t]he prior requirement of 6% of statewide registered voters' signatures counted every signature as 1 vote . . . meaning each vote moved the initiative petition an equal distance closer to the goal of ballot access. After the passage of SB 1108, the value of each signature gathered is in direct relation to the number of registered voters in their district." (Dkt. 11, p. 2 ¶ 5.) He then alleges there are differences in the number of signatures to be counted in Idaho's legislative districts. (*Id.* ¶¶ 9-11.) Plaintiff goes on to claim the following:

> 26. The effectiveness of signing an initiative petition for the Plaintiff is 22% less than Ryan Isbelle had lived in District 10 instead. This is a violation of Ryan Isbelle's equal protection rights guaranteed to him under the 14th Amendment to the United States Constitution.

MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT - 2

>       27. The effectiveness of the Plaintiff's as a circulator is harmed by Idaho Code: 34-1805 as well. His submission of seven signatures on an initiative petition from qualified electors in his district leaves him 22% further from his goal than if he had lived in and submitted signatures for Legislative District 10. This is a violation Ryan Isbelle's equal protection rights guaranteed to him under the 14th Amendment to the United States Constitution.

(Dkt. 11, p. 4.) It now appears that he is a registered voter and submitted his signature in support of this potential ballot initiative.[1] (*Id.* at Ex. C.) Thus, it appears that Plaintiff is claiming two ways to establish standing here: as a petition circulator and as a petition signor. Accordingly, his current arguments appear to align with the U.S. Court of Appeals for the Eighth Circuit's decision in *Bernbeck v. Gale*, 829 F.3d 643 (8th Cir. 2016).

### III.   ARGUMENT

Supreme Court and lower federal court precedent uniformly recognize that States may rely on *total* population to draw election boundaries and not the population of registered voters. Further, no equal protection problem exists if votes are cast in equally populated state legislative districts that were drawn based on Census population data.

    **A.    Idaho Code § 34-1805 is consistent with Supreme Court precedent in respecting the one-person, one-vote principle**.

In *Evenwel v. Abbott*, the Supreme Court confirmed the constitutionality of the widely-used total-population approach to legislative redistricting. Accordingly, a State does not violate the one-person, one-vote principle when it equalizes its state legislative districts using total population rather than voter-eligible population. 136 S. Ct. 1120 (2016). In *Evenwel*, voters in Texas state senate districts with disproportionately large eligible and registered voter populations alleged that Texas' decision to base its apportionment on total population diluted their votes in relation to

---

[1] It remains unclear whether Plaintiff himself submitted the petition regarding minimum wages, but it appears that he has a circulated a petition regarding minimum wages. (Dkt. No. 11 Ex. B.)

voters in other state senate districts, violating the Equal Protection Clause. *Id.* at 1125. They claimed that Texas should draw its state senate districts based on *voter* population, not *total* population. *Id.* The Supreme Court rejected this argument, holding that constitutional history, the Court's prior decisions, and longstanding practice all confirm that a State may properly draw its legislative districts based on total population. *Id.* at 1126–33.

Although *Evenwel* was about the constitutionally guaranteed right to vote and not, as here, the state-created right to place a constitutional amendment on the ballot, the Court's legal analysis applies just as readily to the context of this case.

Looking first to constitutional history, the Court found guidance in the Founders' debates over how congressional districts should be allocated to the States. *Id.* at 1127–29. The "product of these debates," the Court explained, was the Fourteenth Amendment's retention of total population as the congressional apportionment base, not voter population. *Id.* at 1128 (citing U.S. CONST., amend. XIV). The Court reasoned that the Fourteenth Amendment cannot simultaneously permit congressional apportionment based on total population on the one hand, while on the other prohibit the States from apportioning their own legislative districts on the same basis. *Id.* at 1129.

In examining prior case the Court concluded they allowed the States to design legislative districts with equal total populations. *Id.* at 1130–32. The Court analyzed its seminal decision in *Reynolds* and other cases to explain that using total population "serves *both* the State's interest in preventing vote dilution *and* its interest in ensuring equality of representation." *Id.* at 1131 (emphasis in original) (discussing *Reynolds v. Sims*, 377 U.S. 533 (1964)). The Court also pointed out that each of its malapportionment cases looked to total-population figures (and not "eligible-

or registered-voter data") when evaluating whether district maps violated the Equal Protection Clause. *Id.* at 1131.

The Court then evaluated "settled practice" to confirm its conclusion that States may draw their legislative districts based on total population. *Id.* at 1132–33 (citing *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 678 (1970) (stating "unbroken practice … is not something to be lightly cast aside")). The Court observed that "all 50 States and countless local jurisdictions" use total population when drawing legislative boundaries. *Id.* at 1132. Using total population helps ensure that elected representatives "serve all residents, not just those eligible or registered to vote." *Id.* It promotes "equitable and effective representation" by rendering each representative subject to requests and suggestions from the same number of constituents. *Id.* Accordingly, the Court concluded that longstanding practice also supports using total population when drawing legislative districts. *Id.* By contrast, using voter population has "no mooring" in the Equal Protection Clause. *Id.*

### B. Idaho Code § 34-1805 is consistent with federal court precedent that upholds geographic distribution requirements on signature-gathering.

Federal courts that have examined the issue have "uniformly upheld geographic distribution requirements for signature collection when they have been based on equipopulous districts." *Angle v. Miller*, 673 F.3d 1122, 1131 (9th Cir. 2012) (collecting cases); *see Libertarian Party of Va. v. Davis*, 766 F.2d 865 (4th Cir. 1985), *abrogated on other grounds by Lux v. Judd*, 651 F.3d 396 (4th Cir. 2011); *Libertarian Party v. Bond*, 764 F.2d 538 (8th Cir. 1985); *Udall v. Bowen*, 419 F. Supp. 746 (S.D. Ind. 1976). Indeed, the undisturbed holdings of these courts underscore that geographic distribution requirements are "commonplace." *Angle*, 673 F.3d at 1130. These cases demonstrate that *Evenwell's* total-population rubric is not constrained to the voting-rights context;

it applies just as forcefully to cases like this one that involve the state-created right to collect petition signatures.

As previously noted, in *Angle*, the Ninth Circuit upheld Nevada's law requiring ballot initiative proponents to obtain signatures from ten percent of registered voters in each of the State's congressional districts. 673 F.3d at 1127–32. The court explained that Nevada's law was constitutional because it "grants equal political power to congressional districts having *equal* populations." *Id.* at 1129 (emphasis in original). The geographic distribution requirement was subject only to rational basis review, and it easily satisfied that standard because the State had a "legitimate interest in ensuring a minimum of statewide support for an initiative as a prerequisite to placement on the ballot." *Id.* The distribution requirement guarantees that a "proposal has support statewide, not just among the citizens of the state's most populous region." *Id.* at 1135

The Fourth Circuit reached the same result in *Libertarian Party of Virginia v. Davis*, 766 F.2d 865 (4th Cir. 1985). There, the court rejected an Equal Protection challenge to a Virginia law that required a political organization to obtain 200 signatures in each of the State's congressional districts to place presidential and vice-presidential nominees on the ballot. *Id.* at 867–68. The court explained that the law was constitutional because Virginia's congressional districts were required to be apportioned "in such a way as to contain, as nearly as practicable, an equal number of inhabitants," not voters. *Id.* at 868. Virginia's law was thus unlike other *county*-based distribution requirements that had been struck down in prior cases, including most notably the Supreme Court's decision in *Moore v. Ogilvie*, 394 U.S. 814 (1969), due to disparities across the counties' total populations. *Id.* at 868 (collecting cases). Again, *Davis* explicitly approved a *total* population-based signature-gathering requirement, rather than a *voter* population-based requirement.

MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT - 6

In *Libertarian Party v. Bond*, 764 F.2d 538 (8th Cir. 1985), the Eighth Circuit upheld, against an equal protection, challenge a requirement that signatures be obtained from a percentage of voters calculated based on the number of people who voted in the last gubernatorial race in each district in at least one-half of Missouri's nine congressional districts. *Id.* at 544. The court concluded that the geographic distribution requirement was permissible even where there was some variance in the number of signatures required from each congressional district due to the fact that congressional districts were created based on population, rather than the number of registered voters.

In *Udall v. Bowen*, 419 F. Supp. 746 (S.D. Ind. 1976), the district court for the Southern District of Indiana upheld a statute requiring a candidate for presidential primary obtain signatures of 500 registered voters from each of 11 congressional districts as a prerequisite to being placed on the ballot against an equal protection objection because the districts were "substantially equal in population." 419 F. Supp. at 749.

These decisions upholding geographic distribution requirements are also consistent with the reasoning of other decisions striking down distribution requirements based on districts with *unequal* total populations. *See, e.g.*, *ACLU of Nevada v. Lomax*, 471 F.3d 1010, 1021 (9th Cir. 2006); *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1078 (9th Cir. 2003). In *Lomax* and *Cenarrusa*, for example, the court struck down geographic distribution requirements in Nevada and Idaho that utilized counties with unequal total populations. But in both cases, the court made clear that the States could achieve their goal of statewide support by doing precisely what Idaho has done here - use existing state legislative districts containing equal total populations. **\*32** *See Cenarrusa*, 342 F.3d at 1078 ("Idaho could achieve the same end through a geographic distribution requirement that does not violate equal protection, for example, by basing any such

requirement on existing state legislative districts"); *see also Lomax*, 471 F.3d at 1021 ("Nevada could base [its] 13 Counties Rule on legislative districts" containing equal total populations).

The recent ruling in *Semple*, which reversed the denial of a motion to dismiss, comports with this federal precedent. *Semple v. Griswold*, 934 F.3d 1134, 1136-42 (10th Cir. 2019). In *Semple*, the Tenth Circuit Court of Appeals was asked whether a requirement to collect two percent of the registered voters in each of Colorado's 35 state senate districts for a ballot initiative violated the Equal Protection clause of the Fourteenth Amendment. The Tenth Circuit found that it did not violate the Fourteenth Amendment and granted summary judgment in favor of the defendant Secretary of State.

The facts in *Semple* are similar to those alleged here. Much like Idaho, the Colorado constitution gives the citizens of Colorado the power to enact state constitutional amendments through ballot initiatives. *Id.* at 1137 (citing Colo. Const. art. V, § 1(2)). In 2016, Colorado voters approved Amendment 71, a ballot initiative that changed the ballot initiative process. *Id.* Before passage, the Colorado constitution required initiative proponents to gather the signatures of "registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election." *Id.* Amendment 71 changed the Colorado constitution to add the additional requirement that initiative proponents also collect signatures from at least two percent of registered voters in each of Colorado's 35 state senate districts. *Id*.

The plaintiffs alleged that this amendment violated their First Amendment right of political association[2] and, like the Plaintiff here, violated the one-person-one-vote principle inherent in the

---

[2] Plaintiff does not make a First Amendment claim in this case, only a claim for violation of the Equal Protection Clause of the Fourteenth Amendment. (*See generally* Dkt. 11.)

MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT - 8

Equal Protection Clause of the Fourteenth Amendment. More specifically, plaintiffs alleged "that the number of *registered voters* in each state senate district differs considerably." *Id.* at 1138. The court read the complaint "to allege that an inequality in the number of registered voters in each of Colorado's equally populous senate districts dilutes the voting rights of petition signatories who live in districts with a higher number of registered voters." *Id.*

The defendant in *Semple* argued "Plaintiffs' claim failed as a matter of law because every court to consider the matter has held that signature-collection requirements involving ballot initiatives do not violate the Equal Protection Clause as long as the districts from which signatures are collected have substantially the same total population" and cited to *Angle*, *Davis*, and *Bond*. *Id.* at 1139. The defendant also cited to *Evenwell* for the basis that the Equal Protection Clause does not require states to draw their legislative districts based on a registered-voter population rather than total population even if the two numbers differed. *Id.*

The *Semple* court noted that although *Evenwel* "involved the right to vote, not the right to sign a ballot initiative petition," its reasoning governed the outcome of Plaintiffs' Equal Protection claim. *Id.* It noted that the amendment required signatures to be obtained from a sub-group of the total population in each state legislative district and just as in *Evenwel*, the allegation was that this sub-group varied in size from district to district. *Id.* Accordingly, the *Semple* court determined that "Plaintiffs' equal protection claim was the same as that of the plaintiffs in *Evenwel*—that the population of either eligible or registered voters, not the total population, in each state senate district must be equal or voting power is diluted." *Id.* But the *Semple* court agreed with *Evenwell*, and refused "to hold that the principle of one person, one vote requires states to equalize the number of voters in each legislative district." *Id.* (citing 135 S. Ct. at 1131).

The *Semple* court subsequently held that "Supreme Court precedent is clear. No equal protection problem exists if votes are cast in equally populated legislative districts that were drawn based on Census population data." *Id.* at 1141 It further held that "[j]ust as it is not unconstitutional to apportion seats in a state legislature based on districts of equal total population, it is not unconstitutional to base direct democracy signature requirements on total population." *Id.* The court then found that the district court had erred in granting summary judgment to the plaintiff and then subsequently granted summary judgment in favor of the defendant on the equal protection claims, because there was "no dispute that Colorado's thirty-five state senate districts are approximately equal in total population." *Id.* at 1142.

### C. Plaintiff's claim that Idaho Code § 34-1805 violates the equal protection clause fails in light of *Evenwel* and *Semple*.

As a starting point, the relief Plaintiff seeks is to eliminate the geographic distribution requirement of Idaho Code § 34-1805.[3] It thus appears that he is asserting a facial challenge to the statute, although it appears that he may still be pursuing an as-applied challenge since he does couch his claims as "a violation of Ryan Isbelle's equal protection rights under the 14th Amendment to the United States Constitution." (Amended Complaint ¶¶ 26-27.) Regardless, against the backdrop of *Evenwel,* the above cited federal precedent, and most importantly, *Semple*, Idaho Code § 34-1805's geographic distribution requirement is fully consistent with the Equal Protection Clause's one-person, one-vote principle. It does not violate the Equal Protection clause and Secretary Denney should be dismissed.

/ / /

---

[3] "The Plaintiff in this case seeks the remedy of having the geographic distribution clause of Idaho Code 34-1805 added by the passage of SB 1108 (2013) invalidated by the court." (Dkt. 11 p. 5 ¶ 30.)

The facts here are very much the same as in *Semple*, and as such, the same outcome should follow. The geographic distribution component in Idaho Code § 34-1805 requires signature collection from State Legislative districts that are approximately equal in total population. *See* Idaho Const. art. III, § 5 ("A senatorial or representative district . . . [must] comply with the constitution of the United States."). Legislative districts are based upon the "total state population as reported by the U.S. census bureau." Idaho Code § 72-1506(1). Further, "[d]istricts shall be substantially equal in population and should seek to comply with all applicable federal standards and statutes." *Id.* § 72-1506(3). Like Colorado, Idaho has 35 legislative districts that are equipopolous. Unlike Colorado, which requires two percent of signatures from 35 legislative districts, Idaho only requires six percent from 18 of the 35 legislative districts.

The Idaho Supreme Court has ruled that State legislative districts may possess a population deviation of no more than ten percent to pass constitutional muster at the time the districts are drawn. *Smith v. Idaho Com'n on Redistricting*, 136 Idaho 542, 544 38 P.3d 121, 123 (2001) (citing *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983)). And the Idaho Supreme Court has already ruled and determined that Idaho's legislative districts were constitutionally apportioned under the federal constitution for the purposes of the one person, one vote principle when the maximum population deviation was less than ten percent of a population calculated by a ten year census.[4] *Bonneville County v. Ysursa*, 142 Idaho 464, 467-68, 129 P.3d 1213, 1216-17 (2005); *see also Evenwel v. Abbott*, ___ U.S. ___, 136 S. Ct. 1120, 1124, 194 L.Ed.2d 291 (2016) (stating that "all States use total-population numbers from the census when designing congressional and state-legislative districts").

---

[4] Plaintiff has not alleged that the 35 districts are not substantially equal; rather, his sole allegation is that the number of registered voters differs by legislative district. (Dkt. 11 p. 2 ¶¶ 6, 9-11.)

MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT - 11

If Idaho's legislative districts are constitutionally permissible under the federal one person, one vote principle for redistricting purposes, then based upon *Evenwel*, *Semple, ICUB,* and *Angle*, they must also be permissible under this same principle for initiative petition purposes. At bottom, if *Evenwel*'s total-population framework is adequate to protect the right to vote - a fundamental right - it is more than adequate to protect the lesser state-created right to sign an initiative petition. The Equal Protection Clause cannot logically demand different or more stringent protections for petition signers than it does for actual voters. And the outcome in *Semple* follows this conclusion. Accordingly, Idaho Code § 34-1805 does not violate the Equal Protection Clause and just as in *Semple*, the Court should find in favor of the Idaho Secretary of State.

## IV.   CONCLUSION

Plaintiff's claim fails as a matter of law, and accordingly, this matter should be dismissed with prejudice.

DATED this 20th day of December, 2019.

                                          STATE OF IDAHO
                                          OFFICE OF THE ATTORNEY GENERAL

By:   */s/ Robert A. Berry*
        ROBERT A. BERRY
        Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system,

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CMF/ECF Registered Participant in the manner indicated:

| | |
|---|---|
| Ryan Isbelle<br>217 S. Garden Ct., #F<br>Lewiston, ID 83501 | ☒ U.S. Mail<br>☐ Email<br>☐ Certified Mail, Return Receipt Requested<br>☐ Overnight Mail<br>☐ Facsimile |

By: _____*/s/ Robert A. Berry*_____
      Robert A. Berry
      Deputy Attorney General