# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

U.S. COURTS

JAN 09 2020

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

RYAN ISBELLE, )
)
Plaintiff, )
)
V. ) Case No. 1:19-cv-00093
)
LAWERENCE DENNEY )
) **RESPONSE TO MOTION TO DISMISS**
Defendant. )
)
)

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW the Plaintiff, Ryan Isbelle, who hereby submits his Response to Defendants' Motion to Dismiss and states as follows:

## I. FACTS OF THE CASE

1. The Plaintiff lives in Legislative District 6, which means that the value of his signature on a ballot initiative petition is 22% less than if the Plaintiff had lived in Legislative District 10.

2. The other registered voters' signatures from Legislative District 6 that were on the initiative petition signature sheet the Plaintiff has already submitted were 22% less effective at achieving their political action than if they had lived in Legislative District 10.

3. After Legislative District 6 has submitted 1,344 qualified signatures for a ballot initiative petition, any additional qualified signature gathered from that district has absolutely no effect on that ballot initiative petition gaining ballot access if 17 other districts do not also meet their 6% requirement.

4. Voters that live in Legislative District 14 have their voting power diluted more than 40% in comparisons to legislative districts like District 27.

## II. STATEMENT OF FACTS IN DISPUTE

5. The Defendant states in their Motion to Dismiss that the Plaintiff's claim fails as a matter of law and should be dismissed with prejudice.

6. The Defendant claims that signing an initiative petition does not make a citizen an "actual voter".

7. The Defendant claims the Supreme Court's legal analysis in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) should apply in this case.

8. The Defendant claims the legal analysis of *Angle v. Miller*, (9th Cir. 2012) should apply in this case.

## III. ARGUMENTS AND AUTHORITIES

9. Section 1 of the Fourteenth Amendment to the U.S. constitution states:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." [Emphasis Added]

10. Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment. See *Reynolds v. Sims*, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). The ballot initiative, like the election of public officials, is a " 'basic instrument of democratic government,' " *Cuyahoga Falls v. Buckeye Comm. Hope Found.*, 538 U.S. 188, 123 S.Ct. 1389, 1395, 155 L.Ed.2d 349 (2003) (quoting *Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 679, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976)), and is therefore subject to equal protection guarantees. Those guarantees furthermore apply to ballot access restrictions just as they do to elections themselves. See *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) - Citing *Idaho Coalition United For Bears*, (9th Cir. 2003) [Emphasis Added]

11. The Supreme Court has repeatedly upheld that citizens have an equal right to protection under the 14th Amendment when it comes to ballot access and to ballot initiatives. The *Illinois* court even specifically rejected the argument that signing a petition for ballot access differs from a vote at the ballot box.

12. The defendant incorrectly states, "Although *Evenwel* was about the constitutionally guaranteed right to vote and not, as here, the state-created right to place a constitutional amendment on the ballot, the Courts' legal analysis applies just as readily to the context of this case." - Defendant's Motion To Dismiss, Document 14-1, pg. 4.

13. Article XX of the Idaho State Constitution reads:

ARTICLE XX – AMENDMENTS

**SECTION 1.** HOW AMENDMENTS MAY BE PROPOSED. Any amendment or amendments to this Constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds (2/3) of all the members of each of the two (2) houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election [Emphasis Added]

14. Idaho Code 34-1805 (the statute in question containing the ballot initiative geographic distribution clause) does not give the voters of Idaho the authority to propose their own constitutional amendments.

15. "The state-created right to sign a ballot initiative petition – which, unlike the right to vote, is not constitutionally guaranteed – cannot receive more rigorous protection under the Equal Protection Clause than the fundamental right to vote itself." - Defendant's Motion To Dismiss, Document 14-1, pg.2

16. The Defendant claims "The Equal Protection Clause cannot logically demand different or more stringent protections for petition signers than it does for actual voters." - Defendant's Motion To Dismiss, Document 14-1, pg. 12

17. The Plaintiff wholeheartedly disagrees that signing a petition does not make a person an actual voter considering that committing fraud on a state's ballot initiative petition will undoubtedly get one charged with voter fraud. (How can I be classified as a voter if I break the law, but not a voter if I don't?) The head official presiding over the ballot initiative process is the Secretary of State of Idaho, the head election official. Questions from the public to the Secretary of State's office regarding the ballot initiative process are answered by "Election Compliance Specialists". Most important of all, you have to be an up-to-date, registered voter of the state in order to have any eligibility to sign an initiative petition, and can only sign once. In doing so, that person's official, public vote for the petition to be on the ballot is cast and should be weighed equally with all others who meet the same requirements.

18. There is no other logical way to describe how Idaho treats its 18-month circulation period for ballot initiative petitions other than a year-and-a-half election for ballot access. The petitions that have met the requirements in the first election essentially then go to a runoff election that November.

19. Only registered voters of the state have the authority to sign a ballot initiative petition. Registered voters are also the only ones allowed to vote on the ballot initiative during the circulation period. At no point in the ballot initiative process are non-voters relied upon in any way, or given any authority to progress an initiative petition by themselves. The obvious conclusion of those facts is that petition signors are, and can only be, actual voters.

20. "The fact that the constitution itself sanctions inequalities in some phases of our political system does not justify us in allowing a state to create additional ones." - Citing *MacDougal v. Green* (U.S. Supreme Court 1948)

21. Before the passage of Senate Bill 1108 in 2013, the requirements listed in Idaho Code 34-1805 stated that 6% of registered voters in the state were needed to sign an initiative petition in order for that petition to qualify for the next election's ballot.

22. Having the minimum number of signatures calculated to an absolute number ensured that each signature gathered in the state carried equal weight toward the goal of ballot access for the signed petition. There is currently no definitive answer for how many signatures will grant an initiative petition ballot access in Idaho, because Idaho must first use a process of discrimination to apportion value.

23. The 6% of signatures from registered voters statewide at the time of the last general election is still the standard for the minimum combination of signatures that can be submitted for an initiative petition and gain ballot access. For 2020 ballot access, and going by the November 2016 Total Registered Voters numbers posted on the Idaho Secretary of State's website (a copy of which is submitted to the court as Exhibit D), the minimum number is 48,793 signatures.

24. This number is found by taking the total number of registered voters in Idaho as of November 2016 (813,218), and multiplying that number by .06.

25. The maximum combination of signatures possible to be submitted for an initiative petition and fail to gain ballot access in Idaho is much harder to predict. So I calculated a possibility by adding together 100% of registered voter totals from the 17 legislative districts with the most registered voters as of November 2016 (this number will be referred to as Group A). You then take each of the 18 legislative districts with the least registered voters as of November 2016 and multiply each of their number of registered voters by .06, then subtract each result by one. The resulting numbers for those 18 legislative districts are then added together (this number will be referred to as Group B). Once Group A and Group B are calculated, add them together to get the approximated total number of signatures an initiative petition can gather and still fail to gain ballot access.

26. Going by the November 2016 Total Registered Voters numbers posted on the Idaho Secretary of State's

website, that maximum combination adds up to 467,202 signatures for a ballot initiative petition that will still fail to gain ballot access, or 57.4% of the state's registered voters at that time. This number could actually be higher since the most recently posted numbers September 2019 Total Registered Voters numbers posted on the Idaho Secretary of State's website (a copy of which is submitted to the court as Exhibit E) show some districts like Legislative District 14 gaining more than 5,000 additional registered voters. Those addition 5,000+ extra potential signatures would be added to Group A of my calculation for maximum possible signatures.

27. Even if one were to argue this scenario as hyperbole, it is still extremely important to point out. If the stated intention of a state's requirement for ballot access is to ensure a minimum of statewide support from voters before it gains ballot access, it should never, even in the wildest of circumstances, have it be possible for an initiative petition to gain <u>more statewide support from voters than would be needed at the ballot box and still have that initiative petition fail</u>.

28. Idaho legislators do not seem to be near as concerned about statewide support for ballot access when it comes to gaining ballot access for other statewide elections.

29. Idaho Code 34-708 states:

34-708. INDEPENDENT CANDIDATES. (1) No person may offer himself as an independent candidate at the primary election.

(2) Any person who desires to offer himself as an independent candidate for federal, state, district, or county office may do so by complying strictly with the provisions of this section. In order to be recognized as an independent candidate, each such candidate must file with the proper officer as provided by section <u>34-705, Idaho Code, a declaration of candidacy as an independent candidate, during the period specified in section 34-704, Idaho Code. Such declaration must state that he is offering himself as an independent candidate, must declare that he has no political party affiliation, and must declare the office for which he seeks election. Each such declaration must be accompanied by a petition containing the following number of signatures of qualified electors:</u>

(a) One thousand (1,000) for any statewide office

30. The requirement in 34-708 allows every registered voter to be treated equally in the process of choosing candidates for statewide elections, including granting ballot access and then voting for candidates in the general election. Idaho has never shown any concern of a congestion of the ballot in a governor's race, or anything else that relies on a statewide vote for passage.

31. Under 34-708, an independent candidate for governor can gain all 1,000 necessary signatures in just one locality. This includes having all signatures come from the same legislative district. There is much less scrutiny applied to signatures involving candidates for the highest office in Idaho than there is for ballot initiative petitions, even those that would have a minimal impact on voters statewide, such as an initiative focusing on the

horse racing industry in Idaho, like the one on the Idaho ballot in 2018.

32. "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote -- whatever their race, whatever their sex, whatever their occupation, whatever their income and <u>wherever their home may be in that geographical unit</u>. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters, but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions." Citing *Reynolds V. Sims* (U.S. Supreme Court) 1964 [Emphasis Added]

33. "The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." Citing *Reynolds v. Sims*. "(T)here is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State."

34. And, finally, the Court in *Sims* concluded:

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing -- one person, one vote."

35. "Idaho also argues that the geographic distribution requirement furthers other valuable purposes, including preventing a long and confusing list of initiatives from appearing on the ballot, protecting against fraud, informing the electorate, ensuring the "integrity" of the ballot process, and promoting "grassroots direct legislation efforts." Assuming that these are all valid purposes advanced by the geographic distribution requirement, they nonetheless cannot save that requirement, because <u>these purposes could be advanced as effectively and efficiently by another system that would treat voters residing in different geographic areas equally. For example, most if not all of these objectives could be satisfied, even more readily, by simply increasing the statewide percentage of signatures required-from six to twelve percent or to any other percentage Idaho deemed desirable.</u>" - Citing *Idaho Coalition United for Bears* (9th Circuit Court of Appeals) 2003 [Emphasis Added]

36. The 9th Circuit Court of Appeals in *Coalition* admitted that the best way to remedy all of the concerns a state gives as justification for their geographic distribution requirement is to simply increase the total number of registered voters required to sign a petition. The state did not listen to this advice and specifically chose to create yet another system does not treat every voter equally to every other voter in their state.

37. "(V)oting-eligible citizens assume a role similar to that of elected representatives when those voters engage

in the initiative process [Footnote Omitted]. Otherwise, the interests of nonvoters, who the Court acknowledges "have an important stake in many policy debates," would be stifled in the direct-democracy process. This interpretation is consistent with the Supreme Court's statement in Evenwel that the "one-person, one-vote guarantee" can properly be viewed as a guarantee of equal representation, "not voter equality." - Citing *Semple V. Griswold* (10th Circuit Court of Appeals) 2019

38. The logic the 10th Circuit Court applied here is extremely flawed. The court first claims that the legal analysis of *Evenwel* applies directly to cases involving ballot access for initiative petitions because signors of initiative petitions are acting in a role similar to that of elected representatives, but then acknowledges that the "one person, one-vote guarantee" is a guarantee of total populations to have equal representation.

39. If you apply the logic of the 10th Circuit Court, that petition signors play a representational role, it raises the question of why these "representatives" have their voting power diluted based on the number of other "representatives" in their district? If the "one-person, one-vote" principle is to guarantee that total populations have equal representation, it is logical to conclude that the same principle demands that each representative be treated equally. It is contradictory to the goal of equal representation to give the vote of some representatives in excess of 40% more weight than others. At that point, it no longer matters that the districts are equal in population, they no longer have equal representation.

40. The Plaintiff agrees with the dissenting opinion included in *Semple V. Griswold* regarding the majority's opinion that the gathering of signatures for petitions, involves the principles of representational equality. The dissent states:

41. "(T)he majority fails to cite to a single authority of any kind in support of that conclusion. And that is precisely because the conclusion is wrong. When an individual casts a vote or provides a signature, he or she is representing only himself or herself and no one else. Of course, a voter or signator may well have in mind the interests of others when casting a vote or providing a signature. For example, a voter may believe that a particular ballot measure is in the best interests of the people of his or her district or state. But that does not mean that the voter is officially representing anyone else, let alone all of the people in his or her district or state. To conclude otherwise would wreak havoc on our system of elections and, in turn, on the legal framework we have built to address voting-related legal issues. In the case at hand, for example, if a single signator is deemed to represent his or her senate district, then why require any additional signatures in order to assure that a proposed ballot measure carries sufficient support to be placed on the ballot? Or 10 likewise, in terms of voting, why require more than one person in any given senate district to vote on a particular ballot initiative or office?"

42. On this subject, the dissenting judge concludes, "I agree with plaintiffs' counsel: a voter or signator represents only himself or herself. As a result, I conclude that the case at hand does not implicate the principle of representational equality and is thus distinguishable from Evenwel." The Plaintiff asserts the same for his case.

43. There has not been a U.S. Supreme Court that has specifically dealt with the issue of adding a geographic distribution element based on number of registered voters in each of a state's legislative districts to a state's requirement for ballot access.

44. The Defendant relies on the conclusion of *Angle v. Miller* when he states, "Federal courts that have examined the issue have, "uniformly upheld geographic distribution requirements for signature collection when they have been based on equipopulous districts."

45. The Plaintiff challenges the Defendant's claim that the legal analysis of *Angle V. Miller*, (9th Cir. 2012), is applicable in this case. The plaintiffs in that case did not argue that variations in registered voter populations in each congressional district resulted in an Equal Protection violation, and in turn did not present any evidence of what the registered voter populations were in each congressional district. Thus, the case is distinguishable from the case at hand.

46. The Defendant also claims the decisions of *Libertarian Party of Va. v. Davis*, (4th Cir. 1985) and *Udall v. Bowen*, (S.D. Ind. 1976) are applicable to the Plaintiff's case. The Plaintiff's argument to this is again best stated in the dissenting opinion of *Semple v. Griswold*:

47. "Two of the cases cited by defendant involved challenges to laws that...required a specified number of signatures from each equally-populated district, rather than, as in the case at hand, a specified percentage of signatures from registered voters in each district. See Libertarian Party of Va. v. Davis, 766 F.2d 865, 22 868 (4th Cir. 1985) (upholding a Virginia law requiring minor-party presidential candidates to submit signatures from 200 voters in each of the state's 10 congressional districts to gain a place on the ballot), recognized as abrogated on other grounds in Lux v. Judd, 651 F.3d 396 (4th Cir. 2011); Udall v. Bowen, 419 F. Supp. 746, 749 (S.D. Ind. 1976) (upholding an Indiana law requiring presidential candidates, in order to be placed on the primary ballot, to submit 500 signatures from each of the state's 11 congressional districts). Clearly, the laws at issue in these two cases—because they rely on specified numbers of signatures rather than percentages of registered voters in each district—would not present the same problems..." - Dissenting Opinion, *Semple v. Griswold*

48. The dissent in *Griswold* again addresses a similar claim as that of the Defendant that *Libertarian Party v. Bond* is applicable to the case at hand:

49. "In the fourth and final case cited by defendant, Libertarian Party v. Bond, 764 F.2d 538 (8th Cir. 1985), the Eighth Circuit upheld a challenge to a Missouri law governing the formation of new political parties. The challenged law permitted the formation of a new political party if that party filed a timely petition (a) containing signatures from each state congressional district equal to "at least one percent of the total number of votes cast in the district for governor in the last gubernatorial election," or (b) signed "by the number of registered voters in each of one-half of the several congressional districts which [wa]s equal to at least two percent of the total

number of votes cast in the district for governor at the last gubernatorial election." Mo. Rev. Stat. § 115.315(4) (1978). In upholding this law, the Eighth Circuit noted, in pertinent part, that "the Missouri congressional districts [we]re virtually equal in population, as the district boundaries were drawn in 1982 by a three-judge court with population equality as a foremost objective." Bond, 764 F.2d at 544. Notably, the plaintiff also argued "that the State's 23 use of a formula based on a percentage of votes cast in each district in the preceding gubernatorial election, rather than a percentage of the population of each district, create[d] an impermissible discrimination amongst voters." Id. (emphasis in original). But the Eighth Circuit rejected this argument on the grounds that "[t]he minimal variance [that] result[ed] . . . d[id] not reflect an impermissible discrimination amongst voters." Id. In reaching this conclusion, the court cited to a table outlining the number of votes that the law required in each of the nine state congressional districts. Id. at 544 n.4. Those numbers ranged from 4,266 signatures to 5,348 signatures. Id. at 539 n.2. There is no indication, however, that the Eighth Circuit calculated the variance (which was approximately 22.5%). Instead, it appears that the Eighth Circuit's "minimal variance" comment/rationale was based solely on the raw numbers. And, to the extent that the Eighth Circuit silently calculated and relied on the true variance of 22.5%, it made no attempt to explain why it considered this variance "minimal," particularly in light of existing Supreme Court precedent. Consequently, any conclusion that the variance of 22.5% was "minimal" was erroneous." - Dissenting Opinion, *Semple v. Griswold*

50. "The concept of 'we the people' under the Constitution visualizes no preferred class of voters, but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions." Citing *Reynolds v. Sims*

51. Under Idaho Code 34-1805, the state of Idaho creates preferred classes of voters. It is undeniably possible for one group of 48,793 registered voters to gain ballot access for a petition, and have another group consisting of more than nine times as many registered voters fail at the same goal.

52. The biggest preferred class of voters that Idaho creates with this law is registered voters who live in legislative districts that have not yet had 6% of their registered voters sign the petition being circulated. Once a legislative district reaches that 6% threshold, every registered voter in the 94% remaining in the district who have not yet signed has had the value of their signature reduced to 0. The only way their signature can gain any value again is if 18 legislative districts reach the 6% threshold and the petition is still short of the 6% statewide registered voter requirement. Ironically, at that point, every signature gathered for the initiative petition would be weighed equally until the 6% statewide number was reached, but only after Idaho's preferred class of voters have given their approval.

53. Classes of voters that Idaho discriminates against are ones like registered voters who have signed petitions in legislative districts that do not meet the 6% threshold. Just because a voter happens to live in a community that may be politically aligned differently, apathetic to politics in general or whatever reason imaginable that an initiative doesn't reach 6% in a district, their signature will count for nothing until the preferred class of voters have given their approval.

54. The last class of voters, that the Plaintiff can think of, that Idaho discriminates against are voters that signed initiative petitions while living in legislative districts with more registered voters than others. Supreme Court precedent does dictate that legislative districts calculated by total population, and not registered voters, does not violate the Equal Protection Clause. However, Supreme Court precedent is also clear on how those registered voters are to be treated once the legislative districts are drawn.

## IV. CONCLUSION

Idaho Code 34-1805 creates preferred classes of voters who are given obscenely more authority over the ballot initiative process than others. This is a clear violation of the Equal Protection Clause. Therefore, the Defendant's Motion to Dismiss should be dismissed and the Plaintiff should have the ability to have their specific case ruled on.

Respectfully Submited,

__/S/___Ryan Isbelle____

Ryan Isbelle
217 S. Garden Ct. #F
Lewiston, ID 83501
208-553-7951

# Total Registered Voters - November 1, 2016

| Cong. Dist. | Registered Voters |
|---|---|
| 1 | 422,993 |
| 2 | 390,225 |
| Total | 813,218 |

| Leg. Dist. | Registered Voters |
|---|---|
| 1 | 26,943 |
| 2 | 28,207 |
| 3 | 23,607 |
| 4 | 25,639 |
| 5 | 27,101 |
| 6 | 22,392 |
| 7 | 24,005 |
| 8 | 27,818 |
| 9 | 22,100 |
| 10 | 17,648 |
| 11 | 22,951 |
| 12 | 19,739 |
| 13 | 21,228 |
| 14 | 32,192 |
| 15 | 23,498 |
| 16 | 24,867 |
| 17 | 21,920 |
| 18 | 27,785 |
| 19 | 30,022 |
| 20 | 24,800 |
| 21 | 27,148 |
| 22 | 20,531 |
| 23 | 17,719 |
| 24 | 19,956 |
| 25 | 19,863 |
| 26 | 21,302 |
| 27 | 17,248 |
| 28 | 23,482 |
| 29 | 21,527 |
| 30 | 23,567 |
| 31 | 19,759 |
| 32 | 24,453 |
| 33 | 18,466 |
| 34 | 21,886 |
| 35 | 21,849 |
| Total | 813,218 |

| County | Registered Voters |
|---|---|
| Ada | 232,763 |
| Adams | 2,562 |
| Bannock | 41,697 |
| Bear Lake | 3,312 |
| Benewah | 4,967 |
| Bingham | 19,759 |
| Blaine | 12,505 |
| Boise | 4,517 |
| Bonner | 24,328 |
| Bonneville | 49,104 |
| Boundary | 5,896 |
| Butte | 1,480 |
| Camas | 672 |
| Canyon | 85,365 |
| Caribou | 3,643 |
| Cassia | 9,486 |
| Clark | 362 |
| Clearwater | 4,488 |
| Custer | 2,856 |
| Elmore | 10,226 |
| Franklin | 6,214 |
| Fremont | 6,679 |
| Gem | 9,355 |
| Gooding | 6,077 |
| Idaho | 9,600 |
| Jefferson | 13,328 |
| Jerome | 7,853 |
| Kootenai | 77,453 |
| Latah | 22,134 |
| Lemhi | 4,889 |
| Lewis | 2,011 |
| Lincoln | 2,048 |
| Madison | 17,680 |
| Minidoka | 7,762 |
| Nez Perce | 20,381 |
| Oneida | 2,511 |
| Owyhee | 4,694 |
| Payette | 10,532 |
| Power | 3,312 |
| Shoshone | 6,636 |
| Teton | 5,908 |
| Twin Falls | 34,765 |
| Valley | 6,201 |
| Washington | 5,207 |
| Total | 813,218 |

Exhibit D

# Voter Registration Totals – Sept. 3, 2019

**Exhibit E**
Case 1:19-cv-00093-DCN   Document 15   Filed 01/09/20   Page 12 of 12

| Cong. Dist. | Total Registered |
|---|---|
| 1 | 452,935 |
| 2 | 404,896 |
| Total | 857,836 |

| Leg. Dist. | Total Registered |
|---|---|
| 1 | 29,089 |
| 2 | 29,709 |
| 3 | 25,963 |
| 4 | 26,826 |
| 5 | 27,780 |
| 6 | 23,224 |
| 7 | 24,267 |
| 8 | 29,311 |
| 9 | 22,815 |
| 10 | 18,499 |
| 11 | 25,062 |
| 12 | 20,977 |
| 13 | 22,437 |
| 14 | 37,536 |
| 15 | 24,227 |
| 16 | 26,046 |
| 17 | 23,097 |
| 18 | 29,828 |
| 19 | 32,244 |
| 20 | 27,087 |
| 21 | 29,947 |
| 22 | 23,006 |
| 23 | 18,358 |
| 24 | 20,539 |
| 25 | 20,246 |
| 26 | 22,290 |
| 27 | 17,168 |
| 28 | 23,805 |
| 29 | 21,037 |
| 30 | 25,180 |
| 31 | 20,087 |
| 32 | 25,029 |
| 33 | 20,140 |
| 34 | 22,802 |
| 35 | 22,173 |
| Total | 857,836 |

| County | Total Registered |
|---|---|
| Ada | 253,018 |
| Adams | 2,598 |
| Bannock | 41,548 |
| Bear Lake | 3,418 |
| Benewah | 5,143 |
| Bingham | 20,087 |
| Blaine | 13,341 |
| Boise | 4,825 |
| Bonner | 26,436 |
| Bonneville | 52,713 |
| Boundary | 6,237 |
| Butte | 1,484 |
| Camas | 712 |
| Canyon | 91,013 |
| Caribou | 3,682 |
| Cassia | 9,409 |
| Clark | 385 |
| Clearwater | 4,367 |
| Custer | 2,791 |
| Elmore | 10,493 |
| Franklin | 6,130 |
| Fremont | 6,707 |
| Gem | 9,624 |
| Gooding | 6,125 |
| Idaho | 9,779 |
| Jefferson | 13,597 |
| Jerome | 7,953 |
| Kootenai | 82,498 |
| Latah | 22,637 |
| Lemhi | 5,200 |
| Lewis | 1,986 |
| Lincoln | 2,117 |
| Madison | 18,440 |
| Minidoka | 7,759 |
| Nez Perce | 21,238 |
| Oneida | 2,533 |
| Owyhee | 5,059 |
| Payette | 10,963 |
| Power | 3,294 |
| Shoshone | 6,537 |
| Teton | 6,235 |
| Twin Falls | 35,638 |
| Valley | 6,871 |
| Washington | 5,216 |
| Total | 857,836 |